Before we get started, for the Defendants' Council, Mr. Petrocelli and Mr. Tratos, how are you splitting your time? Good morning, Your Honors. Good morning. Mr. Petrocelli, I will be taking 12 minutes of the 20, Mr. Tratos will be taking 8. I represent all the defendants and police except for the two Mayweather parties, and I will go first before Mr. Tratos, if that's okay with the Court. All right, thank you. May it please the Court. Good morning, Your Honors. My name is Hart Rabinovich, and I represent the plaintiffs in these consolidated cases. I'd like to reserve five minutes for rebuttal. The plaintiffs and class members in this case are victims of a fraudulent scheme who are induced into purchasing something, here tickets and pay-per-view packages, to a championship fight that they otherwise would not have. They purchased them in record prices and in record quantities under false pretenses because material facts were intentionally concealed from them prior to the point of sale, specifically in order to drive those sales. As a result, in the aftermath, commentators in the boxing industry and the sports media and the general news media describe defendants' conduct through such bold terms as pulling off a magnificent con, engaging in the fraud of the century, with the result that the paying public was fleeced. Such terms are not ordinarily used to describe mere disappointed consumers who bought something and are merely not pleased that the product or the service did not meet their expectations. Rather, they describe conduct which amounts to actual and active fraud. While every year revenues in the sports area seem to get higher and higher and climb into the stratosphere, including the numbers in this event, which was one of the largest sports events in history, this case is about the little guy, the fans who fund those type of deals and transactions. Well, some courts... Here's what I find difficult about the allegations in your case, because as I read through, for example, one of the complaints, the California Consolidated complaint, it sounds very much as if you're relying for the fraud theory on omissions rather than affirmative misrepresentations. I know there's a couple of tidbits there that would arguably fall within the arena of affirmative misrepresentations, but really it sounds very much an omission, failure-to-disclose theory. And the failure-to-disclose is really about the health condition of an athlete. What do we do with the fact that it's not at all uncommon for athletes, especially at the elite levels, to always play through some type of injury? Where do you draw the line if you were to craft a rule for the court to follow? What are the limiting principles? And you're talking about disclosure of an athlete's physical condition. This was a significant injury, Your Honor, where Mr. Pacquiao had a torn rotator cuff that caused him to stop training, sending his sparring partners home with instructions to keep it specifically confidential and quiet three weeks before they sold the tickets. The line is a materiality factor because it is an omission. The fight went all 12 rounds, didn't it? The fight went all 12 rounds, and as the media reported after the fight, it was essentially a dud. Wasn't Pacquiao even judged to win two to four rounds by the referees? That may have been the case. It's not as if he walked in with his right arm in a cast. There were comments made after the fight that he was unable to use the arm that had the injury anywhere near what his normal performance would have been. And I think who put it best in this case was HBO's own lead commentator, Jim Lampley, who said after the fight that what you had here was a situation where some fans may have thought it would have been a noble endeavor for someone like Mr. Pacquiao, who had been injured, to go into the ring and try to do his best. But the only way that that would have washed with fans and consumers who were purchasing this at the highest price ever for this type of event would have been had they disclosed that in advance so the consumers knew what they were purchasing. But that's why I get to what you're saying. If the complaint is based on a theory of omission, then there's got to be a duty to disclose. Correct. So you're saying, well, if an athlete is injured, you've got to disclose it. Where do you draw the line? What types of injuries? Because it's not uncommon. All right, well, the athlete hurt his shoulder. Now he's going to rest it up so that he can be cleared by the doctor, which happened in this case, and by the regulatory authority as being fit to go forward. So it's a regulation-compliant event. So you're saying under those circumstances, there still has to be an affirmative duty to disclose because the consumer might want to know that in evaluating whether they want to attend the match? There is a duty to disclose because this is an omission claim. And just as in the Charpentier case, there was a duty to disclose found because there was active concealment or partial disclosures where they represented and said, as cited in Paragraph 7 of the California complaint, that Pacquiao stated that he was 100% physically able going into this fight, which was not true. And if you speak a half-truth, you have to come forward and give and speak the whole truth if you do that. And that's what the court in the Charpentier v. Los Angeles Rams case said gave rise to a duty to disclose. You can't psych out your opponents by saying, I'm feeling great, I'm going to win, this is the best fight ever. All of those kind of puffery type statements in sports are now going to give rise to an actionable claim? No, I think the type of things that you just said would be puffery. But here you have a material fact that is objectively verifiable. Mr. Pacquiao had a torn rotator cuff and had been instructed, had stopped training, gone to see orthopedic surgeons, had been instructed to rest the shoulder and not fight for 40 days. As the media reports in the aftermath of this fight made clear, no reasonable consumer would have purchased these pay-per-view packages had that fact been disclosed. Well, obviously you're aware of this whole license approach where cases say, look, fans are simply entitled to attend an event where these two fighters fight. I'd like to address that, Your Honor. The license approach is a contract theory. The best case in this area which the plaintiffs rely and which makes sense out of the license approach and the fraudulent concealment approach and the differences in those legal theories is the Charpentier v. Los Angeles Rams case, which has been the law now for 20 years. That's where the team was moving, right? The team was moving. From Los Angeles to St. Louis? Correct. And they did not disclose that fact to the fans. And there was a fraudulent inducement claim that was allowed to stand by the court of appeals. And they specifically said – That wasn't about the condition of the athletes. That was more of a business matter. I don't know where the team was going to play and for future ticket holders, season ticket holders. I think the case hinged on it being a material fact, a fact that the consumer, the ticket-buying consumer, would have wanted to know at the time they made their decision, just like consumers who buy any other good and service out there. And the decision was not restricted. It's very important if you look at footnote 10 of that opinion. The decision was not restricted just to the type of situation where a team moves. The example given by the California Court of Appeals in that footnote says that had the Rams lied about signing a star quarterback in order to induce sales, the consumers who bought tickets in reliance on that type of representation also would have had a fraudulent inducement claim and been allowed to go forward. And that's completely independent of the license theory, which was a breach of contract theory. We understand. We have no breach of contract claims in this case. And we recognize. There were actually fraud allegations in the Tyson fight as well. And those claims were rejected. But to your point in the footnote in this case, Charpentier, had there been affirmative representations, I think your case would be easier rather than relying primarily on a theory of omission. I think the distinction is, is there a known? They lied about Pacquiao fighting and then another fighter got substituted in, then that would go right in line with that footnote that you're relying on. I think that's one of the distinctions, and it all comes into the materiality analysis in a fraud claim, the uniqueness of this type of event and this type of fight. Unlike the type of examples that have been given by the defendants in their briefs and arguing that in their policy arguments there will be some type of floodgates of litigation, that's not the case here. What you have in this case is a unique event. It took five years to plan. There was tremendous hype behind it. It's not like a football game that is scheduled. It will go on regardless of anything. There's a whole bench of teams there that can be substituted if someone gets injured, and you expect that. Those are things that are contemplated in sport and would make any type of representation perhaps fail the materiality test. Boxing is unique. It's a one-on-one event between two specifically selected prize fighters, and there is no substitution. What happens when someone gets injured is that there's a postponement, and if you look at the quotes in the complaint by the participants in the scheme, such as Mr. Roach, Mr. Pacquiao's trainer, they talked about this and went forward with it for a business purpose. What the court did here is it recognized that you can have a fraudulent concealment claim that is unique and distinct from a contract claim. However, in analyzing the materiality prong of a fraud analysis or a statutory fraud analysis, it came up with a two-pronged analytical approach, is what Judge Klausner called it, and said that if the misrepresentation or omission deals with competitive issues, things that happen in the heat of a game or a referee making a bad call or a coach making a bad strategy move, those are not reasonable statements or omissions that a reasonable consumer would rely on because of the very uncertainty of sport. In great distinction to that, you have decisions that are made for business reasons, and that's what we pled here, and that's the irreversible error that the district court made here, which is our complaint says that this fact, that Mr. Pacquiao had this severe injury, was concealed and suppressed from the public and the consumers buying this for the specific and only reason to drive these sales into record numbers. And had that material fact been disclosed to consumers, consumers would have acted differently. And that brings this case right into the realm of any other consumer fraud case that this court has upheld claims on in many circumstances, whether it's a defective automobile case or a mislabeled food product case alleging consumer fraud. Well, we don't have to go with the district court's two-pronged approach, do we? I agree. I think the correct approach in this case is the approach that the California Court of Appeals took in the Charpentier case, which is if there's a known fact that is concealed from consumers specifically to induce sales and push sales, that gives ride to a valid claim for consumer fraud. And the disputed fact issues behind that are not proper to resolve on a motion to dismiss but must go forward to a later stage where the jury gets to decide, was this a material fact that a reasonable consumer would have acted differently on? Materiality is a fact question. And so is intent. What is the intent of the defendants? Is it that they specifically did this because they were scared they weren't going to get paid like the head of USADA, the drug testing agency, said that they did? And just about everyone else said that this was a cash grab, they kept us quiet because they were scared they weren't going to get paid and risk this humongous payday? Or was it a competition issue? They did it because, as the defendants now state, they didn't want to disclose a weakness, which there's many holes in that argument that I could address. But I think if you apply the test that we advocate and the California Court of Appeals took in the Charpentier case, and particularly that footnote 10 where they say if a team or a sports promoter hides material facts from ticket-buying consumers and the consumers purchase tickets based on those inducements, there's a valid claim of consumer fraud, just like any other consumer fraud case. I guess the problem is always drawing the line. Let's say, by analogy, let's say you wanted to see the play Hamilton, the big, you know, and Lin Miranda, Emanuel Miranda, is the star. Yeah. And he gets laryngitis, but all his promoters say, oh, he's fine, he's going to be it. And then he shows up and it's an understudy. Well, could those people bring a class accident? Look, they wanted to see Miranda. No, I think that situation falls into the type of claim that would not be able to proceed because you expect there to be an understudy in a play or an opera or whatever it may be, just like a football game or a basketball game. There's a whole bench of players. When you go see the Lakers here, you don't have a guarantee that LeBron James is going to play the whole game. He could get hurt, and there's another guy who's going to play his position because they're on the bench, and that's expected. That is the uncertainty of sports. What you have here is something far different. This was a material fact. This was a known fact. It was an objectively verifiable fact that was known well before they sold the tickets. And I think the correct analysis here, again, is in Charpentier. And the other consideration here is when should the risk shift from the entities selling the tickets to the fans? The approach we take effectively balances that against the integrity of the game, and it's really what the NFL has done. I believe it's footnote 16 of our reply brief. We cite the NFL's injury policy, which does require immediate reporting of injuries to players, and it's very detailed, and it does show that to uphold the integrity of the game, especially a game such as football or boxing where they know that there's widespread fan interest, humongous dollars involved, and betting involved, that to uphold the integrity of that, there must be disclosure so that the fans know what they're buying at the time. And this isn't the case of a football player getting hurt in the first quarter and not being able to finish or a bad call. But it does change the nature of competitive sports if you're requiring an affirmative duty to disclose injuries that an athlete is going to kind of nurse the health and do her best despite, like, a sore ankle or swelling knees, for example. I don't think it changes the nature of sports at all, Your Honor. Again, going back to what Mr. Lampley said, who is probably one of the foremost experts in boxing. He's been the voice of boxing on HBO, the lead commentator, for many, many years now. And what he said is there's nothing to have stopped, said this fight couldn't have gone forward and Mr. Pacquiao couldn't have gone into the ring. But his comment, and it's quoted in our reply brief, is that he felt horrible for anyone who bought this because they weren't told what they were buying. If Pacquiao wanted to go into the ring, and some would think that's a noble endeavor to do, he could have done that. But they had to tell the fans that he was doing it while injured. And if they had done that, they wouldn't have sold $500 million of pay-per-view packages. It would have been a considerably lesser amount. But at least then the people who did purchase the pay-per-view packages would have known what they were buying and they wouldn't have had a claim. Those people wouldn't. If there was disclosure, we're getting what we paid for. Yeah, I see. I did go over, but thank you. Thank you. Good morning, Your Honors. Daniel Petruccelli for Defendant Sinopolis, except for the two Mayweather parties. May it please the Court. I have 12 minutes. I believe no matter how one tries to formulate it, the District Court got it exactly right. A ticket to a sports event is a license to view whatever transpires at the event, and there is no right to a refund because the event did not live up to expectations or pre-event statements or nondisclosures. This has been generally called the license approach, and it is not confined to contract theories. And in all the prior cases, all the comparable cases, they're all the gate cases, and I guess this one may be called shoulder gate, Your Honor. But in the Bowers case from the Seventh Circuit, the Indy gate case, where the fans expected 20 race cars. Well, there was no allegations of fraud in that case, was there? Oh, yeah, there was allegations of pre-event disclosures, and there were certainly allegations of fraud in the Mayer case, which is the principal case, Your Honor, from New Jersey. That's the spy gate case that the Third Circuit decided where the patriots were found to have broken rules by spying, by videotaping, coaching signals. And there were claims for fraud in that case. There may have been claims for fraud in the Indy gate case as well. We also have the bite gate case, that's the Castillo case, where there was a premeditated plan by Mike Tyson to get disqualified. We have the bounty gate case from Louisiana, that's the Mancini case, where the NFL penalized the Saints for hard tackles that would injure opposing players. What the judge did is he went through all of these cases, Your Honor, and they came down to some essential propositions, which he, I think, correctly synthesized, which is this, is that you don't, where the essence of your grievance is about the quality of the performance, the nature of the performance, the strategy of the performance, what transpired in the actual event. You don't get your money back, no matter what was said beforehand, by whom, or what was not said. It's by lying by the participants. I mean, the coach says, oh, he's in great shape. He isn't exercising his right arm because he's going to perfect his left punch. I mean, you know, he lies on the application to the Athletic Commission that he didn't have a shoulder injury, and all that doesn't matter. That doesn't matter, Your Honor, for a couple of reasons. First of all, the questionnaire was not disclosed to the public. That was just the Nevada State Athletic Commission, and he was pre-cleared to fight. He was examined by physicians, and he was cleared and found fit to fight after disclosing the shoulder injury. This is all sanctioned and regulated by the Nevada State Athletic Commission, and that's right in the court's opinion. In terms of the statements that were made before the fight, which are chronicled on pages 13 and 14 of the excerpts of record, Your Honor, these are all the typical hype, pre-event promotional statements that are made all the time. I'm feeling great, 100 percent well-conditioned, ready to go. Could you imagine the danger to a fighter of all people if he had to say, I aggravated a prior shoulder injury? Well, I think there's legitimate arguments that can be made over whether the statements and omissions in this case really are what is within the realm of what you can reasonably expect fighters, especially in boxing, to say. But as an analytical matter, when it comes to these types of cases, couldn't there be affirmative misrepresentations or omissions that are so material that it gives rise to a consumer fraud claim? And that is exactly how the cases have broken down, Your Honor. And the cases where the misrepresentations or the omissions have concerned commercial aspects of the purchase of the ticket, unrelated to what transpires at the event. So, for example, when the Browns organization said they were not going to move out of Cleveland and season ticket holders bought their tickets expecting a right to renew the following year, only to find out they were robbed of that right because the team moved to Baltimore. The same thing in the Charpentier case, where the Rams said they were staying put, people bought season tickets, and it turned out that they lost their right to renew because a fan in L.A. or Anaheim isn't going to get a seat in St. Louis the following year. That's where the courts have drawn the line. And every single case in which the misrepresentation or the omission, regardless of the name of the cause of action, contract, consumer fraud, outright fraud, whenever it relates to the actual performance or the quality or the strategy or the competitiveness of the event,  So if a boxing promoter says, I'm going to put up a fighter who has an undefeated record, 30 fights in the past, and hyped it up, and people buy tickets, and this is a fighter who's never won a fight, that's okay. Because while the ultimate purpose is to make more money, it also is a misrepresentation that affects the fighter's performance and the consumer's evaluation as to how well this fighter can fight. You know, if at this fight, instead of seeing Manny Pacquiao fight Floyd Mayweather, it was another fighter, you get your money back. And the Mayer case points this out. I mean, there are some hypos that are so extreme, like, you know, if it's for a badminton match and you paid for a boxing match, or you go to see an NFL game and there's non-NFL players. Yes, there are representations which are so extreme, but we are 10,000 miles away from those cases. Sure, those examples on one end of the extreme where the calls would be a lot easier, but when you're talking about representations that affect performance and also has a business motive, I'm trying to figure out if that distinction even makes sense. The representation could be material enough at least to survive a 12b-6. You know, the business, the money issue is a red herring, Your Honor, for this reason. All ticket promotion is about money. It's always about trying to sell tickets. The fact that a purchaser, the fact that promoters and sports teams and participants and people involved with the event, the leagues are out there promoting these events, is always to induce fan interest to either watch the event or buy tickets or buy the products that the sponsors are advertising. That's not the gravamen of the wrong, though. The gravamen of the wrong is whether the thing that happened was something that related to the actual event itself. Here, what we're talking about is the point of complaining that Pacquiao had a prior injury that he re-aggravated, that nonetheless the Nevada Athletic Commission found him fit to fight after disclosing the injury. And he went in and fought 12 rounds, won a third of them, no knockdowns, went the whole distance. Are the Patriots supposed to disclose when Tom Brady has a severe migraine headache before a game or has soreness in his back so that opposing players can put a target on him? Does it make a difference, unlike the Tom Brady football situation or Miranda with the Hamilton play, that there's a group and people are used to substitutes in it, but when it's a one-on-one thing like this boxing match where there would be no understudy to substitute, does that make a difference? It doesn't make a difference, Your Honor, if the nature of the grievance, as here, is a complaint about your dissatisfaction with what happened at the fight. The gravamen of the claim here is that he went into a fight with a shoulder that had been previously hurt years ago, re-injured again, rested, treated, and examined by physicians and allowed to fight. If he wasn't fit to fight under the Nevada Administrative Code, this is regulated and sanctioned by the Nevada State Athletic Commission, he would not have been allowed to fight. And he was clear to fight, as the doctors said. In that circumstance, it doesn't matter who said what beforehand. If Manny Pacquiao shows up and fights Floyd Mayweather, he could run around the ring the whole time and try to avoid getting hit. In fact, a lot of fighters do that because they have injuries. And also, if you had a disclosure injury as a boxer of all kinds of sporting events, if you had a soreness or a particular area where you were very vulnerable, it would be a target for your opponent. Would it have made a difference if Pacquiao had been knocked down in the first 30 seconds? No, Your Honor. I mean, Sonny Liston went, they call that the phantom punch. He went down in the first round of the second fight against Muhammad Ali, and everybody cried foul then. But that's the nature of sports, as the courts have pointed out. We're not talking about buying a hammer made in the U.S.A. when it turns out it's not made in the U.S.A. We're talking about buying uncertainty, unpredictability, drama, controversy, things that people can argue about all the time, things that relieve us from the daily routine and rigors of our lives. That's what makes sports so addictive to people. That's what makes it so appealing, the uncertainty, the unknown, the unpredictability. And if courts start regulating what people can say and cannot say beforehand about the quality or the strategy or the competitiveness or the performance of the event itself, that would open the floodgates and have the courts, as the mayor court said, actually becoming referees. And lawsuits for referees fixing games or failing to call a pass interference, as we just saw recently when the Rams almost, they got knocked out, the Saints got knocked out of going to the Super Bowl because they failed to call a pass interference. A lawsuit was brought. That lawsuit was dismissed. So when the nature of these representations and omissions involves something extrinsic to the event, as in the Ram case or the Cleveland Brown case, or if you told fans, I'm signing LeBron James, he's actually signed a contract, he will be on the team. And all of a sudden there's all these purchases. And then you show up and it turns out it's not LeBron James, it's Raymond James, and he's a benchwarmer. You get your money back in that situation. That's extrinsic to the actual performance of the event, and that's where the line is drawn, Your Honor. I'd like to yield the rest of your time. Thank you. Good morning. Good morning. I'm Mark Tratos from Greenberg-Trorig, and I represent the defendants Boyd Mayweather and Mayweather Promotions, his promotion company. I would like to take the majority of my time to focus on something that hasn't been addressed by either of my esteemed colleagues. And in particular, it is the difference in quality of the position of the various defendants. We have lumped a whole variety of defendants, including Mr. Mayweather and his company, who are the opponents of Mr. Pacquiao in the same category for this purpose of this case. Because the allegation is that your client had a mole inside the Pacquiao camp and knew of this injury. Your Honor, specifically, the information there is that Mr. Roach saw him, recognized him, took half a day to put him out, and essentially he was there for half a day. That's the allegation that was set forth in the material below. Let's assume for purposes of this argument that is correct, that there was a mole in the camp, and there was some knowledge of an injury that occurred in camp. Because we don't know whether the mole was there before the injury or the mole was there after the injury. None of that's there. The point here is, knowledge of an injury is not knowledge of the medical condition, or the doctor's prognosis, or the doctor's diagnosis, or the ability for the fighter to truly perform. In other words, there is a complete lack of adequacy in the pleading, because without a clear understanding that the injury is of a severe nature that would implicate what he was able to do in the ring, there would be no knowledge equivalent or sufficiency. We must acknowledge that the only person who really knew how severe his injury was, was Mr. Pacquiao himself and his doctor, perhaps. We didn't see the MRIs. We didn't see what was, in fact, the prognosis for his ability to fight. And in fact, the result, as the court has properly noticed, is that he fought 12 rounds, and he won a third of them, in some judges' estimation. In that instance, the knowledge is lacking for the Mayweather defendants in particular. And I suggest they're similarly lacking for HBO, who would not be standing in the doctor's office recording this as well. There is nothing in Anglo-American jurisprudence that suggests that an opponent in a sporting contest would have an affirmative duty or obligation to disclose an injury of an opponent, even if they were aware of it. And the reason for that is simple. And that is because if we had that affirmative obligation of disclosing something, if the information was inaccurate, third-party hearsay, second or third removed, because it was by someone else who saw it, not the individual, we would impose upon the court a flurry of litigation unlike anything we'd ever seen before. Because if the misinformation comes out to the public, and the public is told, well, Manny Pacquiao had an injury in camp, is Mr. Mayweather then subjected to a defamation claim, or a false light claim, or a tortious interference with contractual advantage claim by any of those parties who are now not getting the full benefit of the economics when they attend a professional fight? In other words, what is being proposed by the class action below is that now we're going to impose not only a duty on the injured party, but we're going to impose a duty on their opponent if they suspect some type of injury that's going to implicate this. It would go directly to, as the court below noted, the strategy that Mr. Mayweather would have in deciding if he disclosed that, then Mr. Pacquiao would know to avoid turning his body in a way that that shoulder could get punched. There had been an allegation, specifically by Mr. Pacquiao, at the end of the fight, that Mr. Mayweather knew something about the injury because he targeted his shoulder. I respectfully suggest, Your Honors, that in fact any skilled fighter, when landing a blow and seeing a grimace on your opponent's face, could detect an injury or a potential problem and could just as readily or actively go right after that particular spot again and again and again. We see that all the time with skilled people in the fight game. Just because there is that statement by Mr. Pacquiao that Mr. Mayweather must have known because of the way it was targeted, that implicates nothing more than awareness by an opponent in the ring that he is getting somewhere when he hits a particular opponent in that fashion. In particular, if this court were to impose a brand new duty on all participants at all sporting contests, that they must in fact go public with any information they hear, rumor they know, information they've gleaned, that would change sports as we know it because there would be no uncertainty, no chance, no reason for the contest because essentially the odds makers would figure it out for everyone and you'd just say, don't bother because the odds are not there. It's telling in this case that the professionals in the sports game said we got exactly the fight we expected because Floyd Mayweather is a defensive champion. He is exceptionally skilled in being able to essentially defend himself at all times. We expected a boring fight and so when the complaint is it was a boring fight, it's what most of the professionals had anticipated from the outset. I would conclude simply by saying this court should not assert a new duty on opponents in sporting contests that has never before been recognized and should not be recognized now. Thank you. Thank you, Counsel. A few quick points because I don't think I have a lot of time here, Your Honor. What Mr. Petruccelli is arguing is that sports fans have absolutely no rights and every sports business is really exempt from consumer fraud laws and can never be held accountable. That's not the case. The cases that he relies, the Formula One case, the Tyson case, the Belichick case, none of those cases in contrast to the Charpentier kind of line of cases or here involved a known fact that was concealed prior to purchase in order to induce sales. The Belichick case, which is the most cited case by the Third Circuit, the seller of those tickets was the Jets. The Patriots were the visiting team who came in and cheated. So there was not any attempt by the Jets, who didn't know about the cheating, to suppress known facts from their fans in New York and then sell the tickets and try to make more sales based on the concealment of some known fact. It's completely different than this situation where you had all the defendants together and the promotional companies trying to maximize the number of sales because unlike in an arena or a stadium where there's a finite number of seats, they could have sold an infinite number of pay-per-views here, which was what their goal was. Are you aware of any case that holds, though, the opponent liable for a nondisclosure? I'm not aware of a case that addresses that directly. I think dealing with Mr. Trotter's argument about Mr. Mayweather, two points. One, you can't equate. There's two different entities there, and Mr. Mayweather is wearing two hats. One, he was the athlete participating, but second, he owned a proposal. But what are the Mayweather defendants and HBO defendants doing in this lawsuit? The HBO, they were all involved in promoting and selling these tickets to the consumers here. But what's the duty to disclose that's imposed on opponents? The duty to disclose is based on their exclusive knowledge of facts and their speaking of half-truths. Mr. Mayweather came out and said that he knew everything, as did Mr. Ellerbee, the head of Mayweather Promotions, that they knew everything that was happening in that camp. And if they knew something and concealed a material fact, does anybody believe that he actually knows everything that's happening in the opposing team's camp? I think that's a fact question that's not properly resolved on a 12b6. But I will agree with you that the claims against the Pacquiao defendants, Mr. Pacquiao, Pacquiao's promoter top rank and his employees, is stronger than against the Mayweather defendants. But I do think that and do believe that the claims against the Mayweather defendants are brought in good faith and past the plausibility standard, given that they said they knew everything. And the word everything is an all-encompassing term. But to go back to what Mr. Petruccelli was arguing in those three cases and what makes them distinct from the Charpentier case is that there was no known fact, unlike here. And as that footnote 10 makes clear, when you sign a player, that has to do with the players you're putting on the field, too. The line is not drawn between what happens on the field and what happens off of the field. It's a materiality standard, just like any other consumer fraud case. And while it's not necessary for this court to draw a line to govern how boxing or football or baseball rules are, it's a materiality standard, and you don't have to draw those lines with regard to auto products or food products that are mislabeled. The standard for consumer fraud is, is it a material fact? Does it reach the standard of causing a consumer to have done, acting reasonably under an objective standard, to have acted differently? And had they been known, had they been told the concealed fact, would they have acted differently? And I think the unique uproar that happened in the aftermath of this monumental sports event in May of 2015, it was so different than the examples that they want to give. And even that you, Your Honors, have hinted at about ordinary sports injuries or Tom Brady having a headache. Tom Brady getting a headache the morning of a game does not induce any sales. It happened after the ticket booths were purchased. We've got the point. You've gone over time. Thank you very much to both sides for your very helpful arguments in this interesting case. The matter is submitted.
judges: Gilman, Fisher, Nguyen